IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **MARCIA SCOTT AND ISRAEL SCOTT (for themselves and as a representative of their minor child),** | |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **vs.** | **CIVIL ACTION FILE NO.: 1:19-cv-04330-LMM** |
| **SAFECO INSURANCE COMPANY OF INDIANA, A LIBERTY MUTUAL COMPANY, AND SHILAN PARHAM** | |
| **Defendant.** | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT SAFECO INSURANCE COMPANY OF INDIANA'S MOTION TO EXCLUDE TESTIMONY OF DR. STEPHEN NELSON

### INTRODUCTION

Because Plaintiffs' expert witness, Child Neurologist, Dr. Stephen Nelson offers competent testimony that satisfies Federal Rule of Evidence 702, and case law, Plaintiffs move this Court to deny Defendant Safeco Insurance Company of Indiana's (Safeco's) Motion to Exclude Testimony of Dr. Stephen Nelson.

## FACTS

This case arises from an automobile accident that occurred on August 31, 2017 when pregnant Mrs. Scott and her developing fetus H.S. were injured by the at-fault driver, Shilan Parham, who rear ended them. (Dkt. No. 87 ¶4). Plaintiffs brought this lawsuit to seek recovery on the above referenced matter against their underinsured motorist insurer, Safeco Insurance Company of Indiana, A Liberty Mutual Company (Safeco) for negligent failure to settle claims and negligent hiring, training and supervision concerning the handling of policy-limits demands. (Dkt. No. 87 ¶7-13). Plaintiffs also seek to recover regarding developmental delays caused by the accident to their unborn child. (Dkt. No. 87 ¶4).

On September 11, 2020, Plaintiffs identified Child Neurology Expert, Dr. Stephen Nelson, to provide his opinion regarding minor H.S.'s neurological injury. (Dkt. No. 104-3). Dr. Nelson's report identify his qualifications, the materials reviewed, a summary of his review and that his opinions are based on a reasonable degree of medical certainty. (Dkt. No. 104-4).

Dr. Nelson's Summary of Review is as follows:

On 8/31/2017, Marcia Almeida-Scott was ~37 weeks EGA when she was involved in a motor vehicle accident (MVA). Her KB stain was initially positive but then became negative. Fetal doppler ultrasounds were normal prior to the MVA but

afterwards demonstrated increased middle cerebral artery (MCA) end-diastolic flow velocity (fetal brain sparing effect). She was induced due to abnormal dopplers, and [H.S] was born vaginally on 9/6/2017 without any complications of the delivery. Her Apgars were 8/9 and 1/5 minutes, respectively.

[H.S.] was followed by ENT/Dr. Burton for eustachian tube dysfunction, recurrent ear infections, mouth breathing, snoring, chronic rhinitis, mild intermittent asthma, and speech articulation disorder.  She underwent PET placement in 2/2019 and adenoid removal in 12/2019 with some improvement in symptoms.

[H. S.'s] well-child check on 3/15/2019 by PA Crenson demonstrated abnormal scores for Ages and Stages for 18 months (communication 20, gross motor 55, fine motor 20, problem-solving 20, personal-social 30) consistent with global developmental delay. In fact, at that time, [H.S.] only had a single word. She was referred for therapy at Babies Can't Wait.

At his deposition (Dkt. No. 104-5, deposition transcript of Dr. Nelson) taken by defendant Safeco's counsel on November 3, 2020, Dr. Nelson provided testimony that was based on a reasonable degree of medical certainty:

Q. Well, as we sit here today, you're here to give your expert opinion. Is it your expert opinion that the delay in speech was caused by the car accident?

A. I mean, I think my opinion is that she has developmental delays. Developmental delays can be due to multiple different reasons but *she did have pre-natal dopplers that showed increased profusion that's associated with chronic hypoxia or an increased risk for neurological disability*. As to the cause of that increased profusion, since I'm not an OB, I would defer to an OB. I would just say that -- that it -- but if that -- if that *-- if the accident resulted in a chronic hypoxic state, then -- and that's what's being evidenced by the hyper profusion on doppler, then that would suggest or at least say that the most likely cause of her development disability was the accident.*

But, again, I'm trying to stay in my lane. I'm not an OB and so I will
not offer opinions that are sort of in the obstetrics realm.

(Nelson Dep. 23:3-21).

Dr. Nelson provided his medical opinion as a child neurologist that
"[H.S. had] pre-natal dopplers that showed increased profusion that's
associated with chronic hypoxia or an increased risk for neurological
disability*... if the accident resulted in a chronic hypoxic state, then -- and
that's what's being evidenced by the hyper profusion on doppler, then that
would suggest or at least say that the most likely cause of her development
disability was the accident."* Dr. Nelson then deferred to an obstetrician for
other causes of increased profusion. (Nelson Dep. 23:8-21). Defendant
Safeco did not and does not have any evidence that there are other causes for
the increased profusion and was unable to present any records on this issue
for Dr. Nelson to review during his deposition.

Defendant Safeco's Motion to Exclude Testimony states that "Dr.
Nelson then testified that, to the extent the Accident caused H.S. to
experience a "chronic hypoxic state" while in utero, that typically causes a
different condition than the one claimed by Plaintiffs. The condition is called
"mild hypoxic ischemic encephalopathy,"". (Dkt. No. 104-1, ¶ 3).

4

However, this is a clear misstatement of Dr. Nelson's testimony and it

is not in the deposition transcript.

Instead, the correct testimony is as follows:

Q. Well, and wouldn't it be fair that anything that was from the chronic hypoxic state would have manifested earlier than 18 months?
A. I think that -- that mild hypoxia -- so we see it all the time in kids, for example, the mild hypoxic ischemic encephalopathy. They may not demonstrate developmental delays until they're older and it's because you have to get separation from your peers. So if you have a mild brain injury that results in mild developmental disabilities, it's more subtle and it's not uncommon for it not to be picked up until the child is older. (Nelson Dep. 23:22-25; 24:1-8).

Further testimony by Dr. Nelson show a clearer picture of the

developmental delays of the minor H.S.:

Q. Could a low communication score be temporary?
A. It could. Like I said, there's a differential diagnosis for delays in speech.I mean I think again looking at this child's ASQ's -- if I look -- so this is 18 months so if I go to a 18-month ASQ and I look at the scores. Again, 30 is kind of borderline low for communication, 55 for gross motor is normal, 20 for fine motor is actually delayed. That's now in the black. Problem solving at 20 is delayed. That's down in the black. Personal/social of 30 is in the gray area. So at this time, the child would meet criteria for what we 20 call global developmental delay because there's delays in fine motor, problem solving, and personal/social as well as communication. So that's what I would take from this note.

(Nelson Dep. 24:9-23).

      Q. Dr. Nelson, is defendant's exhibit 52 the 30-month wellness check-up?

      A. Yes.

      Q. And at the 30-month wellness check-up on March 18 of this -- of 2020, which is this year, was 19 everything normal?

      A. Yeah, the -- I mean, the only documented abnormality, again, it was borderline but the personal/social score of 35 and the fine motor score of 30 would be in the gray area. Let's see because communication 50 normal, gross motor 60 normal, fine motor -- actually fine motor 30 would be-- yeah, in the gray so the fine motor and personal/social were sort of the borderline impaired.

(Nelson Dep. 28:14-25; 29:1-2).

      Q. As we sit here today, now that you have had the opportunity to review defendant's exhibit 50 and defendant's exhibit, do you hold the opinion that any speech delay that [H.S.] had or may have had at the 18-month check-up was related to the car accident?

      A. I mean, I think I would come back to what I said in opinion four. I think that additional time and information is needed. I -- you know, I think that the child should get neuropsychological testing when she's a little bit older to clarify the extent and nature of her disabilities. So again, I would say that, you know, it's unclear to me at this time. I think that she's had a history of global developmental delay including speech delays that has improved status post her ENT surgeries as well as with time, but it remains to be seen what her developmental trajectory will be given that she's still young and she hasn't had any development or neuropsychological testing.

      Q. Well, can you state to a reasonable degree of medical certainty that any of the developmental delays that [H.S.] either experienced or continues to experience is related to the August 13, 2017, car accident?

      A. I mean I would say that I would probably put it more in the

possible realm. I think that without that additional information, I
would have a more difficult time saying that they're directly causal
especially given that her speech has improved status post the ENT
surgeries.
 (Nelson Dep. 29:22-25; 30:1-25).


       Q. And without the additional testing, it's hard
       A. No, I would agree.
       MS. GOZA: Objection leading.
       A. I mean I would agree that it's difficult to have conclusive
          opinions in the absence of information. I mean, you know, I
          can base opinions on the information that I have. The more
          information I have, the stronger the opinions that I can give.
          Again, I think that as she gets older and becomes old enough
          to do neuropsychological testing, I think that would be the
          sort of gold standard for trying to determine what the extent
          of her developmental disability is.
(Nelson Dep. 34:25; 35:1-13).

Dr. Nelson's testimony indicates that neuropsychological testing as

minor H.S. gets older will be helpful to determine the extent of her

developmental disability and that his opinions are based on the information

that he has been presented with. Dr. Nelson opined that **... *if the accident***

***resulted in a chronic hypoxic state, then -- and that's what's being***

***evidenced by the hyper profusion on doppler, then that would suggest or at***

***least say that the most likely cause of her development disability was the***

***accident.*** (Nelson Dep. 23:14-18). Dr. Nelson testified that "this abnormal

blood flow is an indication of chronic fetal hypoxia which can result in IUGR or can also be an indication of fetal stress. And so, you know, *what the medical records state is that the OB decided to induce the mother because of the persistent increased in diastolic flow in the MCA."* (Nelson Dep. 36:2325; 37:1-4) … *the records indicate that this was noted after the car accident and that the decision was made to induce the mother*… (Nelson Dep. 37:10-12) *Well, my understanding is she was induced because of the abnormal increased MCA and diastolic blood flow*." (Nelson Dep. 38:1-3).

     *Dr. Nelson testified that "the fetal brain sparring effect was only seen after the car accident* (Nelson Dep. 44:2-3) *…and that dopplers* that were done by OB demonstrated fetal brain sparing effect." (Nelson Dep. 45:4-5). Dr. Nelson stated that "she (H.S.) appears to still have at least some borderline delays and I -- I think that as she ages those will become more obvious. (Nelson Dep. 36:7-10). Dr. Nelson gave his expert opinion to a reasonable degree of medical certainty as a child neurologist and deferred to an obstetrician for that respective opinion. Because Dr. Nelson provided

expert testimony as a child neurologist that is to a reasonable degree of

medical certainty his testimony should not be excluded.

## ARGUMENT AND CITATION OF AUTHORITY

**A. Dr. Nelson Testified to a Reasonable Degree of Medical Certainty that the Accident with Parham Caused H.S.'s Injuries**

Dr. Nelson's testimony meets the requirements of admissibility to satisfy case

law and Federal Rule of Evidence 702 that states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (**a**) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (**b**) the testimony is based on sufficient facts or data;
> (**c**) the testimony is the product of reliable principles and methods; and
> (**d**) the expert has reliably applied the principles and methods to the facts of the case.

**1. Dr. Nelson's First Opinion Should be Admitted**

Dr. Nelson testified to a reasonable degree of medical certainty when he provided

his medical opinion as a child neurologist:

> Q. All right, I want to go through each opinion that you expressed. So the first opinion is opinion number one abnormal increase MCA in diastolic blood flow in the fetus [H.S.] was noted after mother was involved in an MVA. Due to persistence of this

abnormality, delivery was induced. This abnormal blood flow is associated with intrauterine growth restriction and fetal stress. Is that your first opinion?

A. Yes. So in other words, this abnormal blood flow is an indication of chronic fetal hypoxia which can result in IUGR or can also be an indication of fetal stress. ***And so, you know, what the medical records state is that the OB decided to induce the mother because of the persistent increased in diastolic flow in the MCA.***

Q. And do you -- would you say that the OB did that and induced the labor because of the car accident?

A. I don't know what the -- since I'm not an OB and I don't know what the -- why the OB did it or what the thought process was of the OB, I can't say that definitively. All I can say is that ***the records indicate that this was noted after the car accident and that the decision was made to induce the mother***. But I would defer to an OB on further information on, you know, the causes of increased MCA and diastolic flow. It's just increased –

(Nelson Dep. 36:15-25; 37:1-15).

Dr. Nelson provided his medical opinion as a child neurologist and deferred to an obstetrician for the "thought process" of an obstetrician. Further, "His expert testimony, in conjunction with other non-expert evidence, authorized a finding of the requisite causal connection between the collision and the injuries sustained by appellee…It was not error to refuse to strike the physician's testimony in its entirety." Georgia Cas. & Sur. Co. v. Jernigan, 305 S.E.2d 611, 166 Ga.App. 872 (Ga. App. 1983). In this case, Dr. Nelson's expert testimony in conjunction with the medical records evidence that he reviewed and refer to authorizes a finding of the requisite

causal connection between the collision and the injuries sustained by minor

H.S.

Dr. Nelson testified further:

> Q. So as we sit here today, can you say with a reasonable degree of medical certainty why [H.S.] was or why the mother was induced?
> A. ***Well, my understanding is she was induced because of the abnormal increased MCA and diastolic blood flow***. But given that I haven't seen the deposition testimony, if it exists, of the OB who induced her, I would defer to that person on the indications for induction.
> Q. Okay. And is it fair to say that because you are not an obstetrician, you cannot offer medical opinions as we sit here today in that medical modality?
> A. Correct. I'm not an OB so I won't offer OB opinions.

(Nelson Dep.  37:23-25; 38:1-11).

Again, Dr. Dr. Nelson provided his medical opinion as a child

neurologist and deferred to an obstetrician for the "thought process" of an

obstetrician. Dr. Nelson testified with a reasonable degree of medical

certainty that "***my understanding is she was induced because of the***

***abnormal increased MCA and diastolic blood flow***." (Nelson Dep. 38:1-3).

Dr. Nelson continued his testimony:

> A. I guess what I would state is that being involved in a car accident can cause problems with placenta insufficiency or placental flow and that can result in chronic hypoxia and result in -- in this process. But I think as to whether it -- the link between them, you know, I would defer to an OB given that I have not reviewed all of

Mom's prenatal records nor do I manage patients that have this condition, and so, you know, on the specifics of that, I would -- I would defer to an obstetrician.

Q. All right. So I just want to be clear that opinion number one, you cannot say with a reasonable degree of medical certainty that this opinion that you hold was caused by the motor vehicle accident and that is partially because you're not an obstetrician.  Is that fair?

A. Yes. I mean, *again,* I would defer to an obstetrician on things that are within the OB realm

(Nelson Dep.  38:16-25; 39:1-8).

Again, Dr. Dr. Nelson provided his medical opinion as a child neurologist and **deferred to an obstetrician for the "thought process" of an obstetrician.**

Because Dr. Nelson testified to a reasonable degree of medical certainty when he provided his medical opinion as a child neurologist his testimony is admissible.

## 2. <u>Dr. Nelson's Second Opinion Should be Admitted</u>

Testimony of Dr. Nelson:

Q. All right. Now, let's go to your second opinion and the second opinion says [H.S.] had evidence of global development delays in the medical records for which she was referred to therapy. Although, she underwent ENT surgeries including ear tubes and adenoidectomy per the last available records of 12/2019, she

continued to have speech delay. Is that your second opinion in this
case?

A. Yes.

Q. And is it still your opinion as we sit here today, what she
continues to have speech delay?

A. It would appear based on the most recent medical records
that her speech delay has resolved or at least improved.

(Nelson Dep.  39:9-22).

Q. As we sit here today, the delayed speech that we discussed
came at the 18-month visit, is that correct?

A. Yeah, I believe it was around the 15-to-18-month visit, yes.

Q. And can you say with a reasonable degree of medical
certainty that the speech delay at the 15-to-18-month visit was caused
by the car accident?

A. I can say that the speech delay may have been related either
to the eustachian tube dysfunction or ear infections that she had or the
car accident or some other unknown cause, but I can't say definitively
which one was the exact cause. And I think in part that is I would
need to see what her developmental trajectory is over time, over the
next months to, you know, one to two years and then see what the
results of neuropsychological testing are.

Q. So is it fair to say that your professional opinion number two
because you have now been provided subsequent records, which
would include through March of 2020, that that opinion has now
changed as we sit here today?

A. Yeah, I mean I would say that it's changed in her -- in the
sense that her speech appears to have normalized. Honestly, given that
I have not personally examined her nor seen any speech therapy
records, that limits a little bit my ability to interpret her level of
speech. That's why I think that, you know neuro -- neuro
psychological testing would be helpful to clarify what her language
developmental status is as of -- as of today.

Q. And without testing, you can't say to a reasonable degree of
medical certainty, what the cause for the speech delay is, can you?

A. I mean I would have difficulty saying what the cause is because I'm not sure what the extent of the delay is so I think *part of* trying to -- to definitively or -- or to get to a reasonable degree of medical probability causation, *part of -- part of it* is I need to know what the extent of her delays are in all areas.
(Nelson Dep. 40:4-25; 41:1-18).

Dr. Nelson's testimony indicates that neuro psychological testing of H.S. would be helpful to clarify what her language developmental status is as of -- as of today (Nelson Dep.  41:6-9) and that neuropsychological testing as minor H.S. gets older will be helpful to determine the extent of her developmental disability (Nelson Dep.  40:16-20) and that his opinions are based on the information that he has been presented with. ***Dr. Nelson's testimony indicates that "if the accident resulted in a chronic hypoxic state, then -- and that's what's being evidenced by the hyper profusion on doppler, then that would suggest or at least say that the most likely cause of her development disability was the accident."*** (Nelson Dep.  23:13-18). This testimony is admissible because it is to a reasonable degree of medical certainty and requests further investigation as the child becomes older.

"'The testimony must show at least a probable cause, as distinguished from a mere possible cause'). In the alternative, expert testimony stated only in terms of a 'possible' cause may be sufficient if it is supplemented by probative non-expert testimony on causation.

14

Rodrigues, 661 S.E.2d at 143." Wilson v. Taser International, Inc., No. 08-13810 (11th Cir. 12/16/2008) (11th Cir. 2008).

In this case, Dr. Nelson's testimony is made to a reasonable degree of medical certainty and is supplemented by relevant medical records that are probative non-expert testimony on causation.

### 3. **Dr. Nelson's Third Opinion Should be Admitted**

Dr. Nelson's Testimony:

> Q. All right. And then let me go to number three, opinion number three, which is the abnormal fetal dopplers seen after the MVA are associated with quote, fetal brain sparring effect, end quote. Although this implies a response where the fetus tries to protect the brain in the setting of ongoing stress, there is actually a higher incidence of neuro developmental disabilities in these children when tested later in life. Is that your third opinion?
> A. Yes.
> Q. All right. For the fetal brain sparring effect, are you referencing that because of a reference in the OB notes?
> A. I don't recall -- I don't remember if they used that term but that's -- that's the term that is used to describe the -- the hyper profusion or the flow seen on cranial dopplers and the idea is that you -- in the setting of chronic hypoxia or placental insufficiency that the fetus tries to increase blood flow to the brain so that -- because the brain is preferentially profused over the rest of the body.
> Q. All right, so what is brain sparring effect?
> A. So fetal brain
> Q. Is it what you just described to me?
> A. Yeah, so fetal brain sparing effect means that you're sparing injury to the brain by trying to hyper profuse the brain. So the best

15

way to think about it is if normally you have a certain amount of oxygen in the blood and now you have less oxygen in the blood so that the brain can't get enough oxygen to function properly, then the body will compensate by trying to increase the amount of blood flow to the brain such that the same amount of oxygen gets to the brain because it just puts more blood with less oxygen to the brain. But -- but it's not -- it doesn't necessarily prevent the injury, it just sort of reduces the injury. What is seen is if you look at children who have this finding on prenatal ultrasound and then you follow them out over time, you see that there's a higher incidence of neuro developmental disabilities.

Q.What are the neuro developmental disabilities you're talking about?

A.Well, I mean it can be things like ADHD, learning disabilities, developmental delay. Again, it just implies that -- that fetuses who are exposed to this effect may have a higher incidence of disabilities in the future.I mean I would say –

Q. And as we sit here –

A. Go ahead.

Q. Nope, go ahead.

A. I was just going to say that, you know, the extent of that disability, I think, varies between different patients but it's a variety of different disabilities.

Q. And as we sit here today, if there was fetal brain sparring effect, you can't say with a reasonable degree of medical certainty that it was caused by the car accident, can you?

A. I mean what I can say is that *it was only seen after the car accident* and so one of the potential causes is the car accident but if there were other causes in Mom's prenatal history that could also be a cause of it, I didn't review all of her records and since I'm not an OB, I would defer to an OB on other potential causes.

(Nelson Dep. 41:19-25; 42:1-25; 43:1-25; 44:1-8).

Q. So as we sit here today, you can't say with a reasonable degree of medical certainty that Baby [H.S.] suffered from fetal sparing, fetal brain sparing effect, can you?

16

MS. GOZA: Objection leading.

A. No, I can say that dopplers that were done by OB demonstrated fetal brain sparing effect. But beyond that, I'm limited by what's in the medical records and sort of what my knowledge set is but given that I'm not an OB, I would defer to an OB on what the extent of the abnormality was on the ultrasounds as well as what the proper management of that is.

Q. As we sit here today, you can't with a reasonable degree of medical certainty that Baby [H.S.], will suffer from neuro developmental disabilities later in life, can you?

A. No, I mean I can say she has an increased risk for it and that's what I think neuro psychological testing in the future would be helpful. So, you know, I think right now she's what, around three or so, maybe in the next year that might be useful.

Q. So as of right now, any opinions about the neuro development disability and what may result into the future, is only speculation, correct?

A. Well, I would say that additional testing will help to clarify the nature and extent of her disabilities, if any. Again, right now, we're limited to the information that's available in the medical records since I have not personally examined her nor talked with the family nor seen any of the testing evaluations that are described in opinion number four. If I have that additional information, then I would evolve my opinions based on that new information.

Q. And so, again, I just want to clarify, your opinions are made without conducting any tests, correct?

A. Yes. I mean as far as I'm aware, there hasn't been any testing done but -- so my opinions are based on what information is available to date.

Q. And your opinions were based on the medical records that the plaintiff's counsel provided to you, correct?

A. Yes, and like I said my opinions continued to evolve so with the new information that you provided me today, you know, some of my opinions did evolve a little bit. My opinions are never fixed. I adjust them every time I get new information to whatever the new information says.

(Nelson Dep.  44:23-25; 45:1-25; 46:1-20).

Dr. Nelson's expert testimony as a child neurologist was that

"***dopplers that were done by OB demonstrated fetal brain sparing effect***

***and that it was only seen after the car accident***. (Nelson Dep. 45:4-5; 44:2-

3). Dr. Nelson deferred to an obstetrician for an obstetric opinion and stated

that "neuro psychological testing in the future would be helpful." (Nelson

Dep. 45:4-17).

"Georgia case law requires only that an expert state an opinion

regarding proximate causation in terms stronger than that of medical

possibility, i.e., reasonable medical probability or reasonable medical

certainty." Id. at 503, 578 S.E.2d 862. "Questions regarding causation are

peculiarly questions for the jury except in clear, plain, palpable and

undisputed cases."Knight v. Knight, 316 Ga.App. 599, 730 S.E.2d 78, 12

FCDR 2227 (Ga. App. 2012).

Dr. Nelson's testimony, supported by medical records, is to a reasonable

degree of medical certainty and is admissible.

### 4.  Dr. Nelson's Fourth Opinion Should be Admitted

Dr. Nelson's Testimony:

> Q. All right. And to that end, I want to go through your fourth opinion, which says neuro psychological testing, hearing evaluation, speech therapy evaluation, independent medical examination, neuro imaging, review of more recent medical records and deposition testimony, et cetera, would be helpful for refining and clarifying these opinions, correct?
> A. Yes.

(Nelson Dep.  46:21-25; 47:1-3).

Dr. Nelson's testimony that further testing as the child continues to grow and develop would be helpful to clarify his opinions is relevant and admissible. As Dr. Nelson testified "What is seen is if you look at children who have this finding on prenatal ultrasound and then you follow them out over time, you see that there's a higher incidence of neuro developmental disabilities." (Nelson Dep. 43:4-8).


## CONCLUSION

Dr. Nelson's testimony is admissible under a Federal Rule of Evidence 702 and case law because it will help the trier of fact to understand the injuries from the car accident that minor H.S. suffered as a fetus, and how they are affecting her development; is based on sufficient facts and

data; is the product of reliable principles and methods; and has reliably

applied the principles and methods to the facts of the case.

Because Dr. Nelson's testimony is to a reasonable degree of medical certainty,

Plaintiffs request that this Court deny defendant Safeco's Motion to Exclude

Testimony of Dr. Stephen Nelson.


      Respectfully submitted, This ___31st___ day of December 2020.


                        **LAW OFFICE OF J. SCOTT GOZA, LLC**

                        By: ___/s/ Jamillah Goza_____

                        Jamillah Goza
                        Georgia Bar No. 455213
                        Attorney for Plaintiffs

3775 Stagecoach Pass
Ellenwood, Georgia 30294
770-203-8513
Fax: 678-884-6437
jamillahgoza@yahoo.com

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing pleading complies with the font and point selections approved by the Court in Local Rule 5.1C. This brief has been prepared in Times New Roman font, 14 point.

By:   /s/ Jamillah Goza
Jamillah Goza
Georgia Bar No. 455213
Attorney for Plaintiffs

3775 Stagecoach Pass
Ellenwood, Georgia 30294
770-203-8513
Fax: 678-884-6437
jamillahgoza@yahoo.com

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MARCIA SCOTT AND ISRAEL SCOTT (for themselves and as a representative of their minor child),** | |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **vs.** | **CIVIL ACTION** |
| | **FILE NO.: 1:19-cv-04330-LMM** |
| **SAFECO INSURANCE COMPANY OF INDIANA, A LIBERTY MUTUAL COMPANY, AND SHILAN PARHAM** | |
| **Defendant.** | |

## CERTIFICATE OF SERVICE

This is to certify that on this 31st day of December 2020 I electronically filed the foregoing PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT SAFECO INSURANCE COMPANY OF INDIANA'S MOTION TO EXCLUDE TESTIMONY OF DR. STEPHEN NELSON

with the Clerk of Court using CM/ECF system, which will automatically send e-mail notification of such filing to the following:

Hilary W. Hunter, Esq.
Brent J. Kaplan, Esq.
600 Embassy Row, Suite 150
Atlanta, GA 30328

hilary@isenberg-hewitt.com
bjkaplan@isenberg-hewitt.com

Marcia S. Freeman
Waldon Adelman Castilla Heistand & Prout
900 Circle 75 Parkway, #1040
Atlanta, GA 30339
mfreeman@wachp.com

**LAW OFFICE OF J. SCOTT GOZA, LLC**
By:   /s/ Jamillah Goza
Jamillah Goza
Georgia Bar No. 455213
Attorney for Plaintiffs

3775 Stagecoach Pass
Ellenwood, Georgia 30294
770-203-8513
Fax: 678-884-6437
jamillahgoza@yahoo.com