IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARCIA SCOTT AND ISRAEL SCOTT (for themselves and as a representative of their minor child), | |
| | JURY TRIAL DEMANDED |
| Plaintiff, | |
| vs. | CIVIL ACTION FILE NO.: 1:19-cv-04330-LMM |
| SAFECO INSURANCE COMPANY OF INDIANA, A LIBERTY MUTUAL COMPANY, AND SHILAN PARHAM | |
| Defendant. | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO SAFECO INSURANCE COMPANY OF INDIANA'S MOTION FOR SUMMARY JUDGMENT ON MARCIA AND ISRAEL SCOTT'S CLAIMS ON BEHALF OF MINOR CHILD H.S.

## INTRODUCTION

Because the undisputed facts show a causal connection between the acts of

Defendants Safeco Insurance Company of Indiana (Safeco) and Shilan Parham

(Parham) and the injuries to H.S., Plaintiffs' claims against Safeco for negligent

failure to settle and for negligent hiring, training and supervision stand as a matter

of law. Safeco's negligence involves issues of contract disputes that were raised in the joint preliminary report (Dkt. No. 97, p. 3, ¶ 2; p. 4, ¶2) and that were also raised in Safeco's answer (Dkt. No. 2, pg.8, 13th Defense). Plaintiffs have asserted claims for breach of contract within its claims for negligent failure to settle and negligent hiring, training and supervision.

Genuine issues of material fact exist concerning Safeco's policy language that is against public policy. These issues of fact are necessary for Plaintiffs to make a relevant policy limits demand that is acceptable to their underinsured motorist carrier, Safeco. Plaintiffs therefore move this Court, pursuant to Federal Rule of Civil Procedure 56, to deny Safeco's Motion for Summary Judgment.

## FACTS

### A. The Motor Vehicle Accident and Resulting Injuries to H.S.

This case arises from an automobile accident that occurred on August 31, 2017 when pregnant Mrs. Scott and her developing fetus H.S. were injured by the at-fault driver, Shilan Parham, who rear ended them. (Dkt. No. 87 ¶4). Plaintiffs brought this lawsuit to seek recovery on the above referenced matter against their underinsured motorist insurer, Safeco Insurance Company of Indiana, A Liberty

Mutual Company (Safeco) for negligent failure to settle claims and negligent hiring, training and supervision concerning the handling of policy-limits demands. (Dkt. No. 87 ¶7-13). Plaintiffs also seek to recover regarding developmental delays caused by the accident to their unborn child. (Dkt. No. 87 ¶4).

On September 11, 2020, Plaintiffs identified Child Neurology Expert, Dr. Stephen Nelson, to provide his opinion regarding minor H.S.'s neurological injury. (Dkt. No. 104-3).

Plaintiffs' claims arose on the date of the accident, August 31, 2017, *prior to H.S.'s birth, while she was a developing fetus* as indicated by Dr. Nelson's Summary of Review and deposition testimony.

Dr. Nelson's Summary of Review is as follows:

> On 8/31/2017, Marcia Almeida-Scott was ~37 weeks EGA when she was involved in a motor vehicle accident (MVA). Her KB stain was initially positive but then became negative. Fetal doppler ultrasounds were normal prior to the MVA but afterwards demonstrated increased middle cerebral artery (MCA) end-diastolic flow velocity (fetal brain sparing effect). She was induced due to abnormal dopplers, and [H.S] was born vaginally on 9/6/2017 without any complications of the delivery. Her Apgars were 8/9 and 1/5 minutes, respectively.
> [H.S.] was followed by ENT/Dr. Burton for eustachian tube dysfunction, recurrent ear infections, mouth breathing, snoring, chronic rhinitis, mild intermittent asthma, and speech articulation disorder. She underwent PET placement in 2/2019 and adenoid removal in 12/2019 with some improvement in symptoms.

> [H. S.'s] well-child check on 3/15/2019 by PA Crenson
> demonstrated abnormal scores for Ages and Stages for 18 months
> (communication 30, gross motor 55, fine motor 20, problem-solving
> 20, personal-social 30) consistent with global developmental delay. In
> fact, at that time, [H.S.] only had a single word. She was referred for
> therapy at Babies Can't Wait.

(Dr. Nelson's Opinion Dkt. No. 104-4, p.3, III. Summary of Review).

Dr. Hari, H.S.'s pediatrician (Hari Dep. 5:18-19), was deposed on September 2, 2020. (Dkt. No. 102-4, Deposition Transcript of Dr. Hari). Dr. Hari testified that she was unaware that the fetus was even involved in the car accident on August 31, 2017 and the effects of the accident although they were clearly stated in the medical records and she was at the hospital at the time of birth (Exhibit 1- Medical Records) (Hari Dep. 12:3-6; 40:10-16).

Although Dr. Hari was unable to pinpoint the cause of H.S.'s developmental delay, partly because she was unaware of the delivery records, Dr. Nelson upon review of the relevant delivery medical records was able to establish a causal link between the car accident and the developmental delays.

At his deposition (Dkt. No. 104-5, deposition transcript of Dr. Nelson) taken by defendant Safeco's counsel on November 3, 2020, Dr. Nelson provided testimony that was based on a reasonable degree of medical certainty:

Q. Well, as we sit here today, you're here to give your expert opinion. Is it your expert opinion that the delay in speech was caused by the car accident?

A. I mean, I think my opinion is that she has developmental delays. Developmental delays can be due to multiple different reasons but *she did have pre-natal dopplers that showed increased profusion that's associated with chronic hypoxia or an increased risk for neurological disability*. As to the cause of that increased profusion, since I'm not an OB, I would defer to an OB. I would just say that -- that it -- but if that -- if that *-- if the accident resulted in a chronic hypoxic state, then -- and that's what's being evidenced by the hyper profusion on doppler, then that would suggest or at least say that the most likely cause of her development disability was the accident.*

(Nelson Dep. 23:3-18).

Dr. Nelson provided his medical opinion as a child neurologist that "[H.S. had] pre-natal dopplers that showed increased profusion that's associated with chronic hypoxia or an increased risk for neurological disability*… if the accident resulted in a chronic hypoxic state, then -- and that's what's being evidenced by the hyper profusion on doppler, then that would suggest or at least say that the most likely cause of her development disability was the accident."* Defendant Safeco did not and does not have any evidence that there are other causes for the increased profusion and was unable to present any records on this issue for Dr. Nelson to review during his deposition.

Further testimony by Dr. Nelson show a clearer picture of the

developmental delays of the minor H.S.:

       Q. Could a low communication score be temporary?
       A. It could. Like I said, there's a differential diagnosis for
delays in speech. I mean I think again looking at this child's ASQ's --
if I look -- so this is 18 months so if I go to a 18-month ASQ and I
look at the scores. Again, 30 is kind of borderline low for
communication, 55 for gross motor is normal, 20 for fine motor is
actually delayed. That's now in the black. Problem solving at 20 is
delayed. That's down in the black. Personal/social of 30 is in the gray
area. So at this time, the child would meet criteria for what we 20 call
global developmental delay because there's delays in fine motor,
problem solving, and personal/social as well as communication. So
that's what I would take from this note.
(Nelson Dep. 24:9-23).

       Q. Dr. Nelson, is defendant's exhibit 52 the 30-month wellness
check-up?
       A. Yes.
       Q. And at the 30-month wellness check-up on March 18 of this
-- of 2020, which is this year, was 19 everything normal?
       A. Yeah, the -- I mean, the only documented abnormality,
again, it was borderline but the personal/social score of 35 and the
fine motor score of 30 would be in the gray area. Let's see because
communication 50 normal, gross motor 60 normal, fine motor --
actually fine motor 30 would be-- yeah, in the gray so the fine motor
and personal/social were sort of the borderline impaired.
(Nelson Dep. 28:14-25; 29:1-2).

       Dr. Nelson's testified that … *if the accident resulted in a chronic*

*hypoxic state, then -- and that's what's being evidenced by the hyper*

*profusion on doppler, then that would suggest or at least say that the most*
*likely cause of her development disability was the accident.* (Nelson Dep.
23:14-18). Dr. Nelson testified that "this abnormal blood flow is an
indication of chronic fetal hypoxia which can result in IUGR or can also be
an indication of fetal stress. And so, you know, *what the medical records*
*state is that the OB decided to induce the mother because of the persistent*
*increased in diastolic flow in the MCA."* (Nelson Dep. 36:2325; 37:1-4) …
*the records indicate that this was noted after the car accident and that the*
*decision was made to induce the mother*… (Nelson Dep. 37:10-12) *Well,*
*my understanding is she was induced because of the abnormal increased*
*MCA and diastolic blood flow*." (Nelson Dep. 38:1-3).

　　　*Dr. Nelson testified that "the fetal brain sparring effect was only*
*seen after the car accident* (Nelson Dep. 44:2-3) *…and that dopplers* that
were done by OB demonstrated fetal brain sparing effect." (Nelson Dep.
45:4-5). Dr. Nelson stated that "she (H.S.) appears to still have at least some
borderline delays and I -- I think that as she ages those will become more
obvious. (Nelson Dep. 36:7-10). Dr. Nelson gave his expert opinion to a
reasonable degree of medical certainty as a child neurologist.

Dr. Burton, H.S.'s pediatric Ear, Nose and Throat doctor (ENT) (Burton Dep. 10:14-25; 11:1-5) was deposed on August 14, 2020. (Dkt. No. 102-5, Dr. Burton deposition transcript). Dr. Burton's deposition included testimony that her patient [was] a 24-month-old female with a chief complaint of ear infections and speech delay, (Burton Dep. 19:4-7) and that the parents had indicated on the intake form that H.S. had a breathing problem (Burton Dep. 19:18-19). Dr. Burton further testified:

> "You do not get ear infections out of the blue. But if you get ear tubes and you never have another problem, then we just call it a cold. We don't need to further investigate. So I already knew before meeting this patient that the fact that she had ear tubes and was coming to me for a second opinion or whatever I know that there's something else that wasn't addressed, and that's why the patient wasn't happy."

(Burton Dep. 21:11-20).

> So, again, I asked them, "What do you mean speech delay? How is your child communicating? How do you know your child wants juice or whatever?" And it's significant when they said, "She mostly points and grunts." That's not really talking. (Burton Dep. 24:6-10). But a two-year-old who mostly grunts and points, that's more than a little bit behind.

(Burton Dep. 24:16-18).

> So what I often say to parents is, once we decide our child is delayed, as a parent -- of course, you know, we want our child to be the best. So I say to me the goal with speech -- when I see these toddlers, the goal with speech is to be normal by kindergarten. And the only way you're going to do that is to continue to improve all the time."

(Burton Dep. 53:23-25; 54:1-4).


"So early on, you're like, oh, we're just delayed or whatever. And then when there isn't anything else medical and you're still grunting and pointing, some of my two- and three-year-olds then go on and they have more than speech delay. They have other developmental delays…".
(Burton Dep. 58:9-14).


Q.….on September 21 1, 2017, around the time of the child's birth. She was born on September 6th. And there was a car accident where -- that caused birth complications and for the child to be born early. Were you aware of that?
 A. No.
(Burton Dep. 60:19-25).


Q. Again, this is just summarizing that there was a KB stain, increased diastolic flow of the middle cerebral artery. Do you -- Are you familiar with those terms?
A. No. I mean, I've heard of them, but from ENT standpoint, no.
(Burton Dep. 61:17-22).


I see a lot of neurologically impaired kids that have speech delay…(Burton Dep. 67:23-24). So as I look at this, I would be looking at this as, okay, I'm seeing a child who happens to have ear infections but has neurologic developmental delays. …(Burton Dep. 68:4-6). And if you have that speech delay, you're going to have other delays which, again, nothing has been reported to me. …(Burton Dep. 68:10-12). There's a lot of reasons why their speech is delayed because they have a global neurologic issue." …
(Burton Dep. 68:17-19).

Dr. Hari, H.S.'s pediatrician (Dkt. No. 102-4 Hari Dep. 5:18-19)

testified on September 2, 2020, that she was unaware that the fetus was even

involved in the car accident on and the effects of the accident although they

were clearly stated in the medical records and she was at the hospital at the

time of birth. (Exhibit 1-Medical Records) (Hari Dep. 12:3-6; 40:10-16).

Dr. Hari further testified:

> "[H.S.] was 14 days old.
> Q. And what was this purpose of this visit?
> A. As per the notes, Mom had some breathing concerns about child
> being congested and some fast breathing.

(Hari Dep. 14:20-23).

Dr. Hari confirmed in the June 15, 2018 medical notes that

"communication was scoring at lower".  (Hari Dep. 22:4-14), referring to the

nine-month communication score of 30. "[S]he scored 30, which is the gray

zone, which is -- 35 is normal, so she scored in the 30 range." (Hari Dep.

23:1-4).


Dr. Hari testified concerning H.S.'s 18-month wellness Checkup:

> [H.S] "was scoring a little low on the communication at that point. 30,
> which is a gray zone… The speech concern at that time was that she
> was saying only one word, so she's not progressed anywhere from the
> one-year checkup when she was saying one word and she was
> bilingual at home. At that point, we had referred her to Babies Can't

Wait speech therapy through them and she has also had her ear tubes
in February of 2019 done by the ENT.
(Hari Dep. 32:14-22).

At that [18 month checkup] visit, her speech and fine motor skills
were not up on par, especially her saying only one word at that time.
We wanted to get it further evaluated by the speech therapist. And the
easiest way to do it is through the Babies Can't Wait program and
that's why we did a referral at that time.
(Hari Dep. 33:3-7).

Dr. Hari testified that H.S. did in fact undergo speech therapy through

the Babies Can't Wait program. (Hari Dep. 35:16-25; 37:1-21).

Because Plaintiffs do cite to undisputed medical testimony supported

by undisputed medical records that H.S. had injuries arising from the

accident, their claims stand as a matter of law and Safeco's Motion for

Summary Judgment should be denied.


## ARGUMENT AND CITATION OF AUTHORITY

A. **Because there are genuine disputes as to material facts, Safeco is not
   entitled to summary judgment as a matter of law.**


Federal Rule of Civil Procedure 56(a) states that "A party may move for

summary judgment, identifying each claim or defense — or the part of each claim

or defense — on which summary judgment is sought. The court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Because there are genuine disputes as to material facts, Safeco is not entitled to summary judgment as a matter of law.

### B. Plaintiffs' Claims for Negligent Failure to Settle, and Negligent Hiring, Training and Supervision Stand as a Matter of Law

"OCGA § 33-7-11 affords the uninsured motorist provider the right to file defensive pleadings and take other necessary actions. In fact, Georgia law provides that the uninsured motorist provider can answer in its own name, become a party to the litigation, and contest issues of liability, damages and coverage." State Farm Fire & Cas. Ins. Co. v. Terry, 495 S.E.2d 66, 230 Ga.App. 12 (Ga. App. 1997).

Here, Safeco answered in its own name, became a party to the litigation and contested issues of liability, damages and coverage. Safeco raised the following policy language as its 13th defense:

> We will pay under this coverage only after the limits of liability under any applicable liability or bonds policies have been exhausted by payment of judgments or settlements. ***However, if a settlement is made between an insured and the insurer of the uninsured motor vehicle for an amount that does not exhaust the limits of liability under any applicable liability bonds or policies, we will not pay***

***under this coverage unless we previously consented to such***
***settlement in writing. Any judgment for damages arising out of a***
***suit brought without our consent is not binding on us."***
(Dkt. 103-5, p. 41, part C (A) of policy;  Dkt. No. 2, pg.8, Safeco's 13th
Defense (emphasis added))

"[T]he requirement of exhaustion is seen in the legislative scheme in OCGA

[509 S.E.2d 43] § 33-24-41.1(a), and (d), which provide that, when multiple

insurance carriers are involved, a claimant may settle with one for "the limits of

[the] policy" and grant a limited release without compromising claims under any

other policy of insurance."Daniels v. Johnson, 509 S.E.2d 41, 270 Ga. 289 (Ga.

1998).

Although not required pursuant to § 33-24-41.1(a), and (d), Plaintiffs have

requested numerous times that Safeco consent to the policy limits settlement with

the liability carrier, however, Safeco, refuses to provide this consent. (Exhibit 2)

Further, Safeco's policy language that it has raised as its 13th defense that ***"any***

***judgment for damages arising out of a suit brought without our consent is not***

***binding on us."*** is against public policy.

"Under Georgia law, insurance companies are generally free to set the terms

of their policies as they see fit so long as they do not violate the law or judicially

cognizable public policy." Wade v. Allstate Fire & Cas. Co., 324 Ga.App. 491, 751 S.E.2d 153 (Ga. App. 2013).

Therefore, an issue of fact remains as to whether Safeco is attempting to dispute that any judgment arising out of this suit is binding upon it. This issue of fact must be resolved in order for Plaintiffs to make a relevant time limit demand including their O.C.G.A. § 33-7-11(j) time limit demand to Safeco.

> "It is clear that a plaintiff must obtain a judgment against the uninsured motorist before filing suit against an insurer for the bad faith penalty and attorney fees. However, it does not follow that a judgment against the uninsured motorist is a prerequisite for a demand against an insurer under this section. Rather, as we have previously noted, this section contemplates a pretrial demand against the insurer. This code section does not permit an insurer to wait until the insured obtains a judgment against the uninsured motorist before considering the merits of the claim…."Rather, an insurer is required to pay a valid claim within 60 days of its being made, and a valid claim may be [258 Ga. 841] made months and years before the plaintiff obtains a judgment against the uninsured motorist…"The insurer's bad faith, if any, in failing to pay, would be that involved in not paying within 60 days of the demand."
> Lewis v. Cherokee Ins. Co., 375 S.E.2d 850, 258 Ga. 839 (Ga. 1989)" .

By withholding consent of the policy limits settlement with the liability carrier, Safeco is essentially not consenting to this lawsuit. This is against public policy because this lawsuit must take place in order to obtain a judgment against

Safeco but Safeco, in conflict with public policy and O.C.G.A § 33-24-41.1, has already determined that the judgment will not be binging upon it.

Genuine issues of fact exist concerning Safeco's policy language that is against public policy. These issues of fact are necessary in order for Plaintiff to make a relevant policy limits demand that is acceptable to their underinsured motorist carrier, Safeco. Because genuine issues of fact remain, Safeco is not entitled to Summary Judgment as a matter of law.

C. **There is Evidence Showing a Causal Link Between the Accident and H.S.'s Injuries and Damages.**

Dr. Nelson testified to a reasonable degree of medical certainty when he provided his medical opinion as a child neurologist:

> Q. All right, I want to go through each opinion that you expressed. So the first opinion is opinion number one abnormal increase MCA in diastolic blood flow in the fetus [H.S.] was noted after mother was involved in an MVA. Due to persistence of this abnormality, delivery was induced. This abnormal blood flow is associated with intrauterine growth restriction and fetal stress. Is that your first opinion?
> A. Yes. So in other words, this abnormal blood flow is an indication of chronic fetal hypoxia which can result in IUGR or can also be an indication of fetal stress. ***And so, you know, what the***

*medical records state is that the OB decided to induce the mother
because of the persistent increased in diastolic flow in the MCA.*

        Q. And do you -- would you say that the OB did that and
induced the labor because of the car accident?

        A. I don't know what the -- since I'm not an OB and I don't
know what the -- why the OB did it or what the thought process was
of the OB, I can't say that definitively. All I can say is that *the records
indicate that this was noted after the car accident and that the
decision was made to induce the mother*.

(Nelson Dep. 36:15-25; 37:1-12).

Dr. Nelson provided his medical opinion as a child neurologist that

shows a causal link between the accident and the injuries to H.S.

"His expert testimony, in conjunction with other non-expert evidence,

authorized a finding of the requisite causal connection between the collision

and the injuries sustained by appellee…It was not error to refuse to strike the

physician's testimony in its entirety." Georgia Cas. & Sur. Co. v. Jernigan,

305 S.E.2d 611, 166 Ga.App. 872 (Ga. App. 1983).

In this case, Dr. Nelson's expert testimony in conjunction with the

medical records evidence that he reviewed and refer to authorizes a finding

of the requisite causal connection between the collision and the injuries

sustained by minor H.S.

Dr. Nelson testified with a reasonable degree of medical certainty that

"*my understanding is [H.S.'s mother] was induced because of the*

*abnormal increased MCA and diastolic blood flow*." (Nelson Dep. 38:1-3).

Dr. Nelson continued his testimony:

> A. I guess what I would state is that being involved in a car
> accident can cause problems with placenta insufficiency or placental
> flow and that can result in chronic hypoxia and result in -- in this
> process.

(Nelson Dep. 38:16-20).

Dr. Nelson's testimony indicates that *"if the accident resulted in a*

*chronic hypoxic state, then -- and that's what's being evidenced by the*

*hyper profusion on doppler, then that would suggest or at least say that the*

*most likely cause of her development disability was the accident."* (Nelson

Dep. 23:13-18).

> "'The testimony must show at least a probable cause, as distinguished
> from a mere possible cause'). In the alternative, expert testimony
> stated only in terms of a 'possible' cause may be sufficient if it is
> supplemented by probative non-expert testimony on causation.
> Rodrigues, 661 S.E.2d at 143." Wilson v. Taser International, Inc.,
> No. 08-13810 (11th Cir. 12/16/2008) (11th Cir. 2008).

In this case, Dr. Nelson's testimony is made to a reasonable degree of

medical certainty and is supplemented by relevant medical records (also see

Exhibit 1- medical records) that are probative non-expert testimony on causation.

Dr. Nelson further testified:

>  Yeah, so fetal brain sparing effect means that you're sparing injury to the brain by trying to hyper profuse the brain. So the best way to think about it is if normally you have a certain amount of oxygen in the blood and now you have less oxygen in the blood so that the brain can't get enough oxygen to function properly, then the body will compensate by trying to increase the amount of blood flow to the brain such that the same amount of oxygen gets to the brain because it just puts more blood with less oxygen to the brain. But -- but it's not -- it doesn't necessarily prevent the injury, it just sort of reduces the injury. What is seen is if you look at children who have this finding on prenatal ultrasound and then you follow them out over time, you see that there's a higher incidence of neuro developmental disabilities.

(Nelson Dep. 42:18-25; 43:1-8).

Dr. Nelson testified that this fetal brain sparing effect "***was only seen after the car accident***". (Nelson Dep. 43: 23-25; 44:1-3).

"Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty." Id. at 503, 578 S.E.2d 862. "Questions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and

undisputed cases."Knight v. Knight, 316 Ga.App. 599, 730 S.E.2d 78, 12 FCDR 2227 (Ga. App. 2012).

Dr. Nelson's testimony supported by medical records shows proximate causation.

## CONCLUSION

Plaintiffs' claims for negligent failure to settle and negligent hiring, training and supervision stand because they contain contract claims that Safeco's policy language raised as its 13th defense in its answer is against public policy. There are medical records and testimony from Dr. Nelson, Dr. Burton, and Dr. Hari that show how H.S.'s injuries were proximately caused by the car accident at issue. For these reasons, Plaintiffs request that this Court deny Safeco's Motion for Summary Judgment.

Respectfully submitted, This ___7th___ day of January 2021.

LAW OFFICE OF J. SCOTT GOZA, LLC

By: __/s/ Jamillah Goza_____

Jamillah Goza
Georgia Bar No. 455213
Attorney for Plaintiffs

3775 Stagecoach Pass
Ellenwood, Georgia 30294

770-203-8513
Fax: 678-884-6437
jamillahgoza@yahoo.com

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing pleading complies with

the font and point selections approved by the Court in Local Rule 5.1C. This brief

has been prepared in Times New Roman font, 14 point.


By:   /s/ Jamillah Goza
Jamillah Goza
Georgia Bar No. 455213
Attorney for Plaintiffs


3775 Stagecoach Pass
Ellenwood, Georgia 30294
770-203-8513
Fax: 678-884-6437
jamillahgoza@yahoo.com

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MARCIA SCOTT AND ISRAEL SCOTT (for themselves and as a representative of their minor child),** | |
| | **JURY TRIAL DEMANDED** |
| **Plaintiff,** | |
| **vs.** | **CIVIL ACTION** |
| | **FILE NO.: 1:19-cv-04330-LMM** |
| **SAFECO INSURANCE COMPANY OF INDIANA, A LIBERTY MUTUAL COMPANY, AND SHILAN PARHAM** | |
| **Defendant.** | |

## CERTIFICATE OF SERVICE

This is to certify that on this 7th day of January 2021 I electronically filed the foregoing PLAINTIFFS' RESPONSE IN OPPOSITION TO SAFECO INSURANCE COMPANY OF INDIANA'S MOTION FOR SUMMARY JUDGMENT ON MARCIA AND ISRAEL SCOTT'S CLAIMS ON BEHALF OF MINOR CHILD H.S.

with the Clerk of Court using CM/ECF system, which will automatically send e-mail notification of such filing to the following:

Hilary W. Hunter, Esq.
Brent J. Kaplan, Esq.
600 Embassy Row, Suite 150
Atlanta, GA 30328
hilary@isenberg-hewitt.com
bjkaplan@isenberg-hewitt.com

Marcia S. Freeman
Matthew Hurst
Waldon Adelman Castilla Heistand & Prout
900 Circle 75 Parkway, #1040
Atlanta, GA 30339
mfreeman@wachp.com
mhurst@wachp.com

**LAW OFFICE OF J. SCOTT GOZA, LLC**

By:    /s/ Jamillah Goza

Jamillah Goza
Georgia Bar No. 455213
Attorney for Plaintiffs

3775 Stagecoach Pass
Ellenwood, Georgia 30294
770-203-8513
Fax: 678-884-6437
jamillahgoza@yahoo.com