IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARCIA SCOTT and ISRAEL          :
SCOTT, *for themselves and as a* :
*representative of their minor child,*
                                 :
     Plaintiffs,                 :
                                 :
v.                               :
                                 :
SAFECO INSURANCE COMPANY         :     CIVIL ACTION NO.
OF INDIANA, A LIBERTY MUTUAL     :     1:19-cv-04330-LMM
COMPANY, *et al.*,               :
                                 :
                                 :
     Defendants.                 :

## ORDER

This matter is before the Court on Defendant Safeco Insurance Company of Indiana, A Liberty Mutual Company's ("Safeco") Motions for Summary Judgment [102, 103] and Motion to Exclude Testimony [104]. After due consideration, the Court enters the following Order:

### I.   BACKGROUND

On August 31, 2017, Defendant Shilan Parham collided with Plaintiff Marcia Scott—then pregnant with her now-minor child, Plaintiff H.S.—in an automobile accident. At the time of the accident, Ms. Scott and her husband, Plaintiff Israel Scott, maintained an automobile insurance policy with Safeco that included underinsured motorist coverage of up to $100,000 per person and $300,000 per accident. Under the policy, Safeco would not provide such

coverage unless the Scotts exhausted the liability payments available under an at-fault driver's insurance policy. Dkt. No. [103-5] at 41. The policy also required the Scotts to obtain Safeco's consent to any settlement with an at-fault driver or that driver's insurance company. Id. at 42.

Plaintiffs allege that after the collision, H.S. demonstrated increased end-diastolic blood flow in her middle cerebral artery. Dkt. No. [107-1] ¶ 2. According to Plaintiffs' proffered expert, Dr. Stephen Nelson, that is associated with "fetal brain sparing effect," a phenomenon in which the fetus directs blood to the brain to compensate for an oxygen deficiency. Dkt. Nos. [102-7] at 44; [104-4] at 3. "Due to the persistence of th[at] abnormality," Dr. Nelson says, doctors induced Ms. Scott's delivery of H.S. on September 6, 2017. Dkt. No. [104-4] at 3. At birth, H.S.'s pediatrician, Dr. Meenakshi Hari, noted "mild neonatal jaundice" but concluded H.S. was otherwise healthy. Dkt. No. [102-4] at 14–15.

H.S. received several standard medical examinations during her first four months of life. Though notes from those visits indicate some issues, such as congestion and spitting up, H.S.'s pediatrician concluded that H.S. was a normal, healthy infant. See id. at 15–19. But beginning when she was approximately six months old, H.S. began to present with viral infections and nasal and bronchial congestion. After Dr. Hari prescribed a nebulizer treatment and albuterol, H.S. returned to her doctor's office on June 15, 2018 with more nasal congestion. Id. at 22–23. At that visit, a test of H.S.'s communication skills produced a score below

the normal range. Id. at 24–25. By H.S.'s one-year-old checkup, however, her communication skills were normal. Id. at 25.

H.S. returned to her pediatrician on multiple subsequent occasions with persistent colds and a series of ear infections, for which she received repeated antibiotic treatment. Eventually, doctors inserted tubes in her ears to relieve blockages caused by the ear infections. Id. at 27–29. At her 18-month-old visit, H.S.'s pediatrician became concerned by delays in the development of her motor skills and speech skills, which had not progressed since her one-year-old visit. Id. at 34. H.S.'s pediatrician did not attribute the delays to a particular cause and referred H.S. to speech therapy. Id. at 35. At two years old, H.S. continued to display evidence of delayed speech. Id. at 38; Dkt. No. [102-5] at 26. At two and a half years old, however, H.S.'s nurse practitioner noted that H.S.'s speech had improved and thus recommended "hold[ing] off speech therapy at that time." Dkt. No. [102-4] at 42.

Meanwhile, the Scotts attempted to obtain compensation from Ms. Parham's insurance carrier, State Farm. In July 2019,[1] Ms. Scott's counsel asked Safeco for its written consent to a settlement with State Farm, which would have exhausted the liability coverage available under Ms. Parham's insurance policy. Dkt. No. [108-1] at 2. Safeco did not consent. Plaintiffs subsequently filed suit

---

[1] Although the Amended Complaint says Plaintiffs requested Safeco's consent to a settlement on June 12, 2019, the request is dated July 12, 2019. See Dkt. No. [108-1] at 2.

against Safeco in the Superior Court of Gwinnett County, Georgia, alleging Safeco had negligently failed to consent to the proposed settlement and that Safeco "was negligent in hiring, training, and supervising its employees concerning the handling" of such settlement offers. Dkt. No. [1] at 12–13. Plaintiffs did not name Ms. Parham as a defendant at that time. They prayed for damages for Mr. Scott's, Ms. Scott's, and H.S.'s pain and suffering, as well as for medical expenses, lost wages, and Mr. Scott's loss of consortium. Id. at 13–14.

Safeco removed the case to this Court. Ms. Parham moved to dismiss, but because she was not a party to the case the Court denied her motion without prejudice. Plaintiffs then amended their Complaint to add claims against Ms. Parham, who again moved to dismiss. The Court granted that Motion as to Mr. Scott's and Ms. Scott's claims against Ms. Parham because those claims were barred by the applicable statute of limitations. Dkt. No. [82] at 10. H.S.'s claims against Ms. Parham, however, were not time-barred, and the Court allowed those claims to proceed. Id. at 11.

Plaintiffs then filed their final, and currently operative, complaint (the "Amended Complaint"). Plaintiffs collectively raise against Safeco the same two claims they asserted in their original Complaint, and additionally allege that Ms. Parham's negligence caused Ms. Scott and H.S. to suffer injuries. The Amended Complaint now prays for $1,000,000 for H.S.'s "[p]hysical and emotional pain

and suffering" and for $50,000 for Ms. Scott's loss of consortium. Dkt. No. [87] at 6.

Safeco now moves for summary judgment and to exclude four opinions provided by Dr. Nelson. Safeco's first Motion for Summary Judgment, Docket Entry [102], applies to H.S.'s claims—that is, H.S.'s claims against Safeco in Count One and Count Two, and H.S.'s claim against Ms. Parham in Count Three. The second Motion, Docket Entry [103], applies to Mr. and Ms. Scott's claims in Count One and Count Two, as well as to Mr. Scott's loss of consortium claim.[2] Plaintiffs oppose all three Motions.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the

---

[2] Count Three of the Amended Complaint includes an allegation that Ms. Parham negligently injured Ms. Scott. Dkt. No. [87] ¶ 17. As explained below, the Court may consider Ms. Scott's injuries as a predicate to Mr. Scott's loss of consortium claim. However, the Court has already dismissed Ms. Scott's standalone personal injury claim against Ms. Parham as time barred. Dkt. No. [82]. Thus, the Court does not consider Ms. Scott's personal injury allegation an operative part of the Amended Complaint.

applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id. (citations omitted). All reasonable

doubts, however, are resolved in the favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III.   DISCUSSION

In tandem, Safeco's Motions seek summary judgment on every claim in the Amended Complaint. Rather than taking each Motion in turn, the Court addresses Safeco's arguments as to each claim in the Amended Complaint. Because the outcome of Safeco's Daubert Motion affects the Court's analysis of H.S.'s claim, the Court leaves H.S.'s claim for last.

### A.   Motions for Summary Judgment as to Plaintiffs' Claims Against Safeco

#### i.   Count One

Count One of Plaintiffs' Amended Complaint raises a claim for Safeco's "Negligent Failure to Settle." Dkt. No. [87] at 3. Plaintiffs allege Safeco negligently failed to settle Plaintiffs' claims "within the policy limits," and that in doing so "Safeco placed its own interests in front of the interests of its insured." Id. ¶¶ 9–10. This language apparently refers to the July 2019 offer from Ms. Parham's insurer to settle Ms. Scott's and H.S.'s claims for the $50,000 limit set by Ms. Parham's insurance policy. See Dkt. No. [108-1] at 2 (communication of offer to Safeco by Plaintiffs' counsel).

Under Georgia law, "[a]n insurance company may be liable for the excess judgment entered against its insured based on the insurer's bad faith or negligent refusal to settle a personal claim within the policy limits." Cotton States Mut. Ins.

Co. v. Brightman, 580 S.E.2d 519, 521 (Ga. 2003); see also Camacho v. Nationwide Mut. Ins. Co., 13 F. Supp. 3d 1343, 1354 (N.D. Ga. 2014). Thus, four events precede failure-to-settle claims. First, an injured party asserts a claim against an insured. Second, the injured party offers to settle the case for an amount that does not exceed the amount of liability coverage offered by the insured's insurance policy. Third, the insured's insurance company refuses to accept that offer, allowing the case to continue. Fourth, a jury returns a verdict that exceeds the policy's coverage or the insured is forced to agree to an excessive settlement. See Trinity Outdoor, LLC v. Cent. Mut. Ins. Co., 679 S.E.2d 10, 13 (Ga. 2009).

In other words, "the insured may sue the insurer for failure to settle only when the insurer had a duty to settle the case, breached that duty, and its breach proximately caused damage to the insured beyond the damages, if any, contemplated by the insurance contract." GEICO Indem. Co. v. Whiteside, No. S21Q0227, ____ S.E.2d ____, 2021 WL 1521527, at *7 (Ga. Apr. 19, 2021) (alterations omitted) (quoting Delancy v. St. Paul Fire & Marine Ins. Co., 947 F.2d 1536, 1546–47 (11th Cir. 1991)). "The rationale" underlying these claims "is that the interests of the insurer and insured diverge when a plaintiff offers to settle a claim for the limits of the insurance policy." Id. (quoting First Acceptance Ins. Co. of Ga., Inc. v. Hughes, 826 S.E.2d 71, 74 (Ga. 2019)). As that language implies, failure-to-settle claims invariably involve an insurer's mishandling of a claim *against its insured.*

This case is entirely different. Here, Plaintiffs have asked Safeco to consent to a settlement with an alleged tortfeasor's insurance company pursuant to Plaintiffs' insurance policy. Plaintiffs are on offense, not defense; no one has asserted a claim against them. In this situation, Safeco is not "gambling with the funds of [its] insured" by withholding consent, and no failure-to-settle claim is possible. McCall v. Allstate Ins. Co., 310 S.E.2d 513, 515 (Ga. 1984) (considering situations where "the insured is making a claim against the insurance company for injuries to the insured under the uninsured motorist provisions of [the insured's] policy").[3]

Plaintiffs do not dispute this well-established view of negligent-failure-to-settle claims. Instead, Plaintiffs argue their insurance policy violates public policy. However, they provide no support for that assertion. Plaintiffs also aver that Safeco "is attempting to dispute that any judgment arising out of this suit is binding upon it" and is "essentially not consenting to this lawsuit" by refusing to accept State Farm's settlement offer. Dkt. No. [107] at 14. Regardless whether Safeco has behaved in this manner, Plaintiffs clearly have not raised a cognizable

---

[3] O.C.G.A. § 33-7-11(j) provides a separate cause of action for a bad faith refusal to *pay* an insurance claim, as opposed to a failure to settle a claim. See McCall, 310 S.E.2d at 514–15 (distinguishing failure-to-settle from failure-to-pay claims). To the extent Count One raises such a claim, it also fails as a matter of law because "a plaintiff must obtain a judgment against the uninsured motorist before *filing suit* against an insurer" under § 33-7-11(j). Lewis v. Cherokee Ins. Co., 375 S.E.2d 850, 851 (Ga. 1989); see O.C.G.A. § 33-7-11(j) ("The question of bad faith . . . shall be determined in a separate action filed by the insured against the insurer after a judgment has been rendered against the uninsured motorist in the original tort action."). Plaintiffs have not obtained the prerequisite judgment.

failure-to-settle claim under Georgia law. Summary judgment is therefore **GRANTED** as to Count One of the Amended Complaint.

    *ii.*  *Count Two*

  The second count of Plaintiffs' Amended Complaint alleges Safeco "was negligent in hiring, training and supervising its employees concerning the handling of policy-limits demands." Dkt. No. [87] ¶ 12. Though Plaintiffs do not explicitly specify the conduct to which this allegation applies, the reference to "policy-limits demands" implicates Safeco's refusal to accept State Farm's $50,000 settlement offer. Safeco argues it is entitled to summary judgment on this claim because Plaintiffs' purported cause of action simply does not exist under Georgia law. Safeco contends it owed Plaintiffs only a contractual duty created by the policy and argues Plaintiffs cannot transmute an alleged breach of that duty into a tort claim. Dkt. No. [103-1] at 17–18.

  The Court agrees. "Under Georgia law, a plaintiff may not sue in tort for a defendant's mere breach of a duty imposed by a contract." <u>Delancy</u>, 947 F.2d at 1545 (citing <u>Sheppard v. Yara Eng'g Corp.</u>, 281 S.E.2d 586, 587 (Ga. 1981)). An insured has a tort-law cause of action against their insurer only when the insurer "breaches a duty imposed by tort law independent of the contract to avoid harming the plaintiff." <u>Id.</u> As discussed above, an insurer may in some cases have a duty to settle, and declining to do so may constitute a breach of that duty. However, this Court has repeatedly recognized that Georgia law supplies no general duty to handle claims in a competent manner. "[O]utside of th[e] narrow

context" of negligent or bad-faith failure to settle, "Georgia law is clear that improper claims handling is a matter of contract, not tort." Camacho, 13 F. Supp. 3d at 1363 (citing Tate v. Aetna Cas. & Sur. Co., 253 S.E.2d 775, 776 (Ga. Ct. App. 1979)); see also Armstead v. Allstate Prop. & Cas. Ins. Co., No. 1:14–cv–586–WSD, 2014 WL 6810727, at *10 (N.D. Ga. Dec. 3, 2014) ("Plaintiff's negligence claims are based on the manner in which State Farm processed Plaintiff's claim for coverage under the Policy. State Farm's alleged duty to Plaintiff arises, if at all, under the Policy and thus can only support a claim for breach of contract."); Arrow Exterminators v. Zurich Am. Ins. Co., 136 F. Supp. 2d 1340, 1354–55 (N.D. Ga. 2001).

Here, Safeco cannot have breached a duty to settle because that duty arises only when a claim is levied against an insured; Plaintiffs allege only that Safeco should have consented to State Farm's offer to settle Plaintiffs' claims against Ms. Parham. Thus, Plaintiffs' claim for negligent hiring, training, and supervision is merely a complaint about Safeco's handling of Plaintiffs' claims "and, therefore, raise[s] only breach of contract issues." Arrow Exterminators, 136 F. Supp. 2d at 1355; see also Tate, 253 S.E.2d at 776–77 (plaintiff's allegation that an insurer had "us[ed] an unlicensed and incompetent [claim] adjuster and personnel" raised only breach of contract issues). Because Safeco owed Plaintiffs only contractual duties, "relief lies in contract, not tort," and Plaintiffs' tort claim for negligent hiring, training, and supervision fails as a matter of law. Camacho, 13 F. Supp. 3d at 1364. In accordance with Georgia law, the Court **GRANTS**

Safeco's Motions for Summary Judgment as to Count Two of the Amended Complaint.

## B. Motion for Summary Judgment as to Israel Scott's Loss of Consortium Claim

In the "General Damages" section of Plaintiffs' Amended Complaint, after the counts pleaded against Safeco and Ms. Parham, is the following item: "Loss of consortium for Mr. Scott: $50,000." Dkt. No. [87] at 6. Safeco argues the Court should grant summary judgment on this claim because it is derivative of Ms. Scott's personal injury claim, which the Court has already dismissed as time-barred. Dkt. No. [103-1] at 9–10. Mr. Scott responds that a loss of consortium claim is subject to a different statute of limitations and argues Georgia law allows loss of consortium claims to proceed despite the dismissal of an underlying personal injury action. Dkt. No. [108] at 5–6 (citing Bohannon v. Futrell, 375 S.E.2d 637, 639 (Ga. Ct. App. 1988)). In reply, Safeco argues Mr. Scott has not adequately pleaded the elements of a loss of consortium claim and has pointed to no record evidence supportive of that claim. Dkt. No. [111] at 3–4.

First, Safeco is incorrect that the dismissal of Ms. Scott's personal injury claims dooms Mr. Scott's claim. A spouse's claim for loss of consortium fails when the other spouse cannot recover against the alleged tortfeasor for substantive reasons. See White v. Hubbard, 416 S.E.2d 568, 569–70 (Ga. Ct. App. 1992). But "the fact that the statute of limitation[s] has run on the underlying claim is of no consequence to the viability of the derivative loss of consortium

claim." Huddle, 821 S.E.2d at 68 (quoting Beamon v. Mahadevan, 766 S.E.2d 98, 101 n.8 (Ga. Ct. App. 2014)); see also Huntington v. Fishman, 441 S.E.2d 444, 446 n.1 (Ga. Ct. App. 1994); Whitten v. Richards, 523 S.E.2d 906, 910 (Ga. Ct. App. 1999). The Court dismissed Ms. Scott's personal injury claims because those claims were untimely and because Ms. Scott could not overcome the statute of limitations by relating her attempt to add those claims back to her original Complaint. See Dkt. No. [82] at 6–10. These claims were not dismissed on a substantive basis. That means the loss of consortium claim survives their dismissal.

"[L]oss of consortium [i]s a separate and independent claim" consisting of two elements: "tortious injury to the spouse" and the resultant loss of that spouse's consortium. Pattee v. Ga. Ports Auth., 477 F. Supp. 2d 1272, 1278 (S.D. Ga. 2007) (reviewing Georgia cases); see also Timms v. Version Allsteel Press Co., 520 F. Supp. 1147, 1149 (N.D. Ga. 1981) (loss of consortium claim is "separate and distinct"). Safeco claims Mr. Scott has not pleaded these elements. But the Amended Complaint states that Ms. Scott "suffered personal injuries" from her collision with Ms. Parham and specifically asks for loss of consortium damages. Dkt. No. [87] ¶ 17. Mr. Scott might be precluded from recovering for the loss of his wife's consortium if "nothing in the pleadings . . . [could] reasonably be said to have placed [Safeco] on notice that such damages were sought," but the Amended Complaint clearly provides such notice. Dunn v. McIntyre, 246 S.E.2d 398, 399 (Ga. Ct. App. 1978). The fact that Safeco's counsel repeatedly questioned

Mr. Scott during his deposition about the loss of consortium claim reinforces that conclusion. See Dkt. No. [103-4] at 8, 36, 38, 44.

Safeco next attacks Mr. Scott's loss of consortium claim on substantive grounds, arguing he has not "present[ed] any evidence that [Ms.] Scott suffered any injuries as a result of the accident" with Ms. Parham. Dkt. No. [111] at 5. Reading the record in the light most favorable to Mr. Scott, the Court disagrees. Georgia courts have placed few limits on the nature of the tortious injury that allows a spouse to maintain a loss of consortium claim; only "pure accident[s]" and "nonnegligent act[s]" are clearly out of bounds. Pattee, 477 F. Supp. 2d at 1277 (quoting Hightower v. Landrum, 136 S.E.2d 425, 428 (Ga. Ct. App. 1964)). Mr. Scott has not averred that Ms. Parham harmed his wife by accident. Instead, he alleges Ms. Parham negligently collided with Ms. Scott. A reasonable jury could conclude that the collision left Ms. Scott in pain, see Dkt. No. [103-4] at 39, that Mr. Scott took Ms. Scott to the hospital after the collision, id. at 19, that Ms. Scott stayed in a hospital for multiple days after the collision, id. at 20–21, and that Ms. Scott gave birth multiple weeks earlier than she would have had the collision not occurred, id. at 22. Drawing every reasonable inference in Mr. Scott's favor, the Court cannot say as a matter of law that Ms. Scott suffered no tortious injuries from her collision with Ms. Parham.

A rational trier of fact could also find that Mr. Scott lost some amount of Ms. Scott's consortium as a result. "Consortium" is a broad term that encompasses "the marital rights and duties of the spouses inter se, the reciprocal

rights and duties of society, companionship, love, affection, aid, services, cooperation, sexual relations, and comfort." <u>Lee v. Thomason</u>, 627 S.E.2d 168, 172 (Ga. Ct. App. 2006) (quoting <u>W.J. Bremer Co., Inc. v. Graham</u>, 312 S.E.2d 806, 808 (Ga. Ct. App. 1983)). The Court is mindful that loss-of-consortium claims are fact-dependent and generally for juries to decide. <u>See id.</u> ("Damages for loss of consortium are not capable of exact pecuniary measure and must be left to the enlightened conscience of impartial jurors taking into consideration the nature of the services, society, companionship and all the circumstances of the case." (quoting <u>Mortensen v. Fowler-Flemister Concrete, Inc.</u>, 555 S.E.2d 492, 494 (Ga. Ct. App. 2001))). Mr. Scott has testified that after the collision he returned home from his post at the University of Georgia, and the longer commute he is now required to make has strained his relationship with Ms. Scott. Dkt. No. [103-4] at 7–8, 34. A reasonable jury could conclude that the stress on Mr. Scott's marriage fits within Georgia courts' capacious definition of marital consortium. Accordingly, Safeco's Motion for Summary Judgment as to Mr. Scott's loss of consortium claim against Ms. Parham is **DENIED**.

### C.   <u>**Daubert**</u> **Motion**

The only claim that remains to be addressed is Count Three: H.S.'s personal injury claim against Ms. Parham. The basis of that claim is that Ms. Parham's collision with Ms. Scott caused prenatal injuries to H.S. that have delayed the development of H.S.'s communication and fine motor skills. Plaintiffs seek to support this claim with the testimony of Dr. Stephen Nelson, a pediatric

neurologist. After reviewing H.S.'s medical records, Dr. Nelson communicated to Plaintiffs' counsel four opinions regarding H.S.'s neurological development before and after she was born. Dkt. No. [104-4] at 3. Safeco has filed a motion under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) to exclude Dr. Nelson's testimony about these four opinions. Safeco argues that, to the extent H.S. has experienced any abnormal medical issues, Dr. Nelson cannot trace those issues to the collision with a reasonable degree of medical certainty. Dkt. No. [104-1] at 12.

Federal Rule of Evidence 702 governs the admissibility of proposed expert evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

The trial court, as the evidentiary gatekeeper, must determine that proffered expert testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Daubert, 509 U.S. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). The trial court must also "make

certain that an expert . . . employs in the courtroom the same level of intellectual

rigor that characterizes the practice of an expert in the relevant field." <u>Kumho

Tire Co. Ltd. v. Carmichael,</u> 526 U.S. 137, 152 (1999). The Eleventh Circuit has

condensed Rule 702's inquiry into the following test:

> Expert testimony may be admitted into evidence if: (1) the expert is
> qualified to testify competently regarding the matters he intends to
> address; (2) the methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined by the sort of
> inquiry mandated in *Daubert*; and (3) the testimony assists the trier
> of fact, through the application of scientific, technical, or specialized
> expertise, to understand the evidence or to determine a fact in issue.

<u>City of Tuscaloosa v. Harcros Chems.</u>, 158 F.3d 548, 562 (11th Cir. 1998).

The federal evidentiary standard interacts with state substantive law: In

Georgia, to allow an inference of medical cause and effect an expert's opinion

must be stated "in terms stronger than that of medical possibility, i.e., reasonable

medical probability or reasonable medical certainty." <u>Zwiren v. Thompson</u>, 578

S.E.2d 862, 867 (Ga. 2003). "Failure to meet this burden means that the . . .

causation expert's opinion would not assist the trier of fact under Rule 702

because his degree of certainty would not be sufficient to establish probable cause

and would thus be irrelevant." <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300,

1320 (11th Cir. 1999) (analyzing Georgia law). Thus, if Dr. Nelson's opinions

relate to the cause of H.S.'s alleged medical issues, the Court must exclude them

if Dr. Nelson cannot state them with a reasonable degree of medical probability

or certainty. However, if his opinions are unrelated to causation, "they must

merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble

before the jury," <u>City of Tuscaloosa</u>, 158 F.3d at 565, and "concern[] matters that are beyond the understanding of the average lay person," <u>United States v. Frazier</u>, 387 F.3d 1244, 1262 (11th Cir. 2004). They must also not offend under other rules of evidence.

    *i. First Opinion*

   Dr. Nelson reviewed fetal doppler ultrasounds performed on H.S. before and after the collision. According to Dr. Nelson, the former "were normal." Dkt. No. [104-4] at 3. However, Dr. Nelson states in his first opinion that "[a]bnormal increased [middle cerebral artery] end-diastolic blood flow in [H.S.] was noted after [Ms. Scott] was involved in [the collision]. Due to [the] persistence of this abnormality, delivery was induced. This abnormal blood flow is associated with intrauterine growth restriction and fetal stress." <u>Id.</u> Dr. Nelson testified during his deposition that he cannot state with a reasonable degree of medical certainty that the collision caused these issues. Dkt. No. [102-7] at 40–41. Safeco argues that, as a result, his opinion must be excluded. Dkt. No. [104-1] at 13.

   However, Dr. Nelson's first opinion is not causation testimony at all. The first sentence merely states an observation gleaned from H.S.'s medical records and notes a temporal relationship between the collision and H.S.'s abnormal end-diastolic blood flow. It asserts no causal relationship between the two. The second sentence likewise recites an observation, as Dr. Nelson explained at his deposition: "[W]hat the medical records state is that the [obstetrician] decided to induce the mother because of the persistent increase[] in diastolic flow" in the

middle cerebral artery. Dkt. No. [102-7] at 39. Dr. Nelson acknowledged that he does not know whether the obstetrician induced labor because of the collision, id., but his first opinion says nothing about that matter.

Likewise, the final sentence of Dr. Nelson's opinion merely states that there is a correlation between increased end-diastolic blood flow and other prenatal complications. Dr. Nelson does not attempt to draw a causal link between H.S.'s increased end-diastolic blood flow and the developmental delays she suffered after birth. That may affect the probative value of Dr. Nelson's statement, but the association he describes is still relevant: If a condition observed in H.S.—which appeared after the collision—is not benign but is associated with other prenatal developmental issues, Plaintiffs' theory that the collision caused H.S. to suffer developmental delays grows stronger. See Daubert, 509 U.S. at 591 (whether evidence assists the trier of fact "goes primarily to relevance"); Fed. R. Evid. 401(a) (relevant evidence "has any tendency to make a fact more or less probable than it would be without the evidence"). The significance of such a correlation in this case is for a trier of fact to decide. See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."). Dr. Nelson's first statement is therefore admissible under Rule 702.

ii.   *Second Opinion*

Dr. Nelson next states that H.S. "had evidence of global developmental delay in the medical records for which she was referred to therapy. Although she

underwent ENT surgeries including ear tubes and adenoidectomy per the last available records of 12/2019, she continued to have speech delays." Dkt. No. [104-4] at 3. Safeco raises two objections to this opinion. First, it points to Dr. Nelson's testimony that H.S.'s most recent medical records show her speech delay "has resolved or at least improved." Dkt. No. [104-1] at 14 (quoting Dkt. No. [102-7] at 41). Second, Safeco argues Dr. Nelson "admit[ted]" he cannot say with a reasonable degree of medical certainty that the collision with Ms. Parham caused H.S.'s speech delay. Id. at 15.

Again, these objections are inapposite because Dr. Nelson does not opine about causation. The first sentence of Dr. Nelson's opinion merely recites what he observed during his review of H.S.'s records and is entirely consistent with Dr. Hari's testimony that H.S. evidenced delayed speech development at her 18-month-old checkup. Dkt. No. [102-4] at 30. Regardless whether the development of H.S.'s speech is *still* delayed, Safeco does not dispute that medical staff noted a delay when H.S. was 18 months old. Dr. Nelson's statement that he gleaned that fact from undisputed medical records does not relate to the cause of the delay. Thus, it is irrelevant that Dr. Nelson cannot attribute H.S.'s speech delay to the collision with a reasonable degree of medical certainty. Dkt. No. [102-7] at 42. He need not "meet th[at] burden" because he does not attempt to address causation. Allison, 184 F.3d at 1320.

Dr. Nelson's second opinion would also assist a trier of fact. Testimony from a pediatric neurologist about H.S.'s medical records would help a lay jury

understand the contents of those records. Furthermore, Dr. Nelson's statement that H.S. displayed developmental delays even after receiving ear tubes is relevant to the issue of causation even though it does not address causation directly. According to Dr. Deborah Burton, H.S.'s ear, nose, and throat specialist, chronic ear infections can lead to "muffled hearing," which may contribute to "speech delay." Dkt. No. [102-5] at 68. If speech does not improve after ear tubes alleviate blockages in the ears, the delay might be attributable to another cause. See id. at 55. Thus, the fact that H.S.'s medical records show delayed speech development after the insertion of ear tubes supports the idea that something besides ear infections caused the delay. Dr. Nelson's second opinion therefore passes muster under Rule 702.

### iii.    Third Opinion

Dr. Nelson's third opinion likewise does not assert a cause-and-effect relationship; it does not even address H.S.'s health directly. It states: "The abnormal fetal dopplers seen after the [collision] are associated with 'fetal brain sparing effect.' Although this implies a response where the fetus tries to protect the brain in the setting of ongoing stress, there is actually a higher incidence of neurodevelopmental disabilities in these children when tested later in life." Dkt. No. [104-4] at 3.

Safeco raises the same objections as above: It argues Dr. Nelson cannot testify with a reasonable degree of medical certainty that the collision caused fetal brain sparing, or that H.S. actually exhibited fetal brain sparing in utero. Dkt. No.

[104-1] at 15–16. Again, Dr. Nelson's third opinion concerns general correlations and is therefore not subject to the standard Georgia law imposes on experts testifying about medical causation. Moreover, the existence of an association between the kinds of doppler readings H.S. presented in utero and post-birth neurodevelopmental disabilities could help a trier of fact decide whether there is a causal relationship in this case. See Edwards v. Safety-Kleen Corp., 61 F. Supp. 2d 1354, 1358 (S.D. Fla. 1999) ("general[]" testimony "regarding benzene as a leukemogenic agent" was admissible where plaintiff alleged benzene caused a decedent's death from a leukemia-like illness). Again, Dr. Nelson's inability to opine about causation affects to the probative value of his statement but supplies no basis for excluding that statement under Rule 702.[4]

> iv.    Fourth Opinion

---

[4] In arguing that Dr. Nelson's third opinion should be excluded from evidence, Safeco argues Dr. Nelson is "*unqualified* to opine as to whether H.S. suffered from fetal brain sparing effect, much less if the [collision] caused it." Dkt. No. [104-1] at 16 (emphasis added). Because Safeco's Daubert motion does not mention Dr. Nelson's professional credentials, the Court interprets Safeco's statement as a challenge to Dr. Nelson's knowledge of H.S.'s medical condition—not to his qualification to provide expert testimony about that condition.

To the extent Safeco disputes Dr. Nelson's "knowledge, skill, experience, training, or education," the Court finds such a dispute unfounded. Fed. R. Evid. 702. Dr. Nelson has stated, and Safeco does not dispute, that he is a board-certified neurologist and pediatrician, holds professorships in neurology and pediatrics, and maintains a pediatric neurology practice. Dkt. No. [104-4] at 1. Thus, "a preponderance of proof," Daubert, 509 U.S. at 592 n.10, indicates Dr. Nelson is "the type of person who should be testifying" about associations between doppler readings, fetal brain sparing effect, and neurodevelopmental disabilities, Moore v. Intuitive Surgical, Inc., 995 F.3d 839, 852 (11th Cir. 2021).

Dr. Nelson's fourth opinion is that "[n]europsychological testing, hearing evaluation, speech therapy evaluation, independent medical examination, neuroimaging, review of more recent medical records and deposition testimony, etc. would be helpful for refining and clarifying these opinions." Dkt. No. [104-4] at 3–4. At deposition, Dr. Nelson explained that this statement enumerates "recommendations as to what additional evaluations or . . . testing might be indicated to further clarify the extent of [H.S.'s] developmental disabilities." Dkt. No. [102-7] at 11. Safeco contends this opinion would not assist the trier of fact in understanding the evidence or determining any facts in issue. Dkt. No. [104-1] at 18. As Safeco reads it, Dr. Nelson's fourth opinion says nothing about causation—either with respect to prenatal abnormalities or post-birth developmental issues—and only "point[s] out the lack of foundation present in [Dr. Nelson's] other opinions." Id.

The Court agrees that Dr. Nelson's fourth opinion is not probative of causation. Unlike his other opinions, which describe relevant interpretations of medical data and identify correlations between those data and patient health outcomes, Dr. Nelson's fourth opinion merely describes the kinds of information that would buttress his other opinions. However, that does not mean Rule 702 requires the Court to exclude his opinion. Dr. Nelson's fourth opinion "help[s] the trier of fact to understand the evidence"—namely, Dr. Nelson's other opinions. Fed. R. Evid. 702(a). By identifying relevant data that he does not have,

Dr. Nelson's fourth opinion allows a trier of fact to weigh his other three opinions more intelligently.

The "overarching subject" of a Daubert inquiry "is the scientific validity and thus the evidentiary relevance and reliability" of the "principles and methodology" of proposed expert testimony. Daubert, 509 U.S. at 594–95. Safeco has offered no reason to question Dr. Nelson's methods, which essentially consisted of reviewing H.S.'s medical records and describing associations between the data in those records and certain health outcomes. Safeco remains free to object to Dr. Nelson's testimony on these or other matters at trial. See Hull v. Merck & Co., Inc., 758 F.2d 1474, 1477 (11th Cir. 1985) (per curiam) (stating that Rule 702 does not permit speculative, irrelevant, or confusing testimony). Furthermore, as Daubert noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596. The Court finds that Dr. Nelson's opinions "meet[] the standards of Rule 702" and are admissible as expert testimony. Id. Accordingly, Safeco's Motion to Exclude those opinions is **DENIED**.

### D.    Motion for Summary Judgment as to H.S.'s Claims Against Ms. Parham

The final matter before the Court is Safeco's Motion for Summary Judgment as to H.S.'s personal injury claim against Ms. Parham. As is by now clear, the basis for this claim is that Ms. Scott's collision with Ms. Parham injured

H.S. in utero, which has caused H.S. to experience developmental delays. Pointing to deposition testimony from H.S.'s physicians, Safeco questions whether H.S. suffered developmental issues at all and contends that, if she did, it is beyond dispute that the collision did not cause those issues. Dkt. No. [102-1] at 19– 21.

Some testimony supports this view—principally, Dr. Hari's plain statement that H.S.'s speech delay was not caused by the collision with Ms. Parham. Dkt. No. [102-4] at 43. Nonetheless, the parties genuinely dispute the cause and severity of delays in the progression of H.S.'s speech and fine motor skills. First, Dr. Hari offered no view on the cause of H.S.'s delayed development of fine motor skills, though she implied the delay could simply be idiopathic. See id. at 36. Second, Mr. and Ms. Scott told Dr. Burton that H.S. "mostly points and grunts." Dkt. No. [102-5] at 26. By that point, H.S. was two years old and her hearing was normal. Id. at 30. That cuts against Dr. Hari's suggestion that H.S.'s speech delay could have been caused by her recurrent ear infections. Dr. Burton explained that she found H.S.'s pointing and grunting to be "significant" because "that's more than a little bit behind" for a two-year-old child. Id. at 26.

Dr. Nelson's opinions and testimony cast further doubt on the notion that H.S.'s delays were unrelated to Ms. Scott's collision with Ms. Parham. After reviewing H.S.'s records, Dr. Nelson testified that H.S. showed "global developmental delay" at 18 months old, with "borderline low" communication skills and delayed motor and problem-solving skills. Dkt. No. [102-7] at 26. Dr.

Nelson also said that that H.S.'s prenatal doppler reading "evidenced" a "chronic hypoxic state," which would "suggest or at least say that the most likely cause of [H.S.'s] developmental disability was the accident." Id. at 23. Viewing this testimony in the light most favorable to H.S. and drawing every reasonable inference in her favor, a trier of fact could infer a causal link between the collision and H.S.'s developmental delays.

Because "summary judgment is such a lethal weapon . . . caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1303 (11th Cir. 2016) (alterations omitted) (quoting Tippens v. Celotex Corp., 805 F.2d 949, 952–53 (11th Cir. 1986)). In this case, cross-cutting testimony from multiple physicians makes summary judgment inappropriate. Granting summary judgment on H.S.'s claim against Ms. Parham would require the Court to "weigh conflicting evidence or make credibility determinations of its own." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011); see also Feliciano v. City of Miami Beach, 707 F.3d 1244, 1252 (11th Cir. 2013) ("[C]redibility determinations and the weighing of evidence 'are jury functions, not those of a judge.'" (quoting Anderson, 477 U.S. at 255)). Thus, Safeco's Motion for Summary Judgment as to H.S.'s claim against Ms. Parham is **DENIED**.

**IV.   CONCLUSION**

In light of the foregoing, Defendant Safeco's Motions for Summary Judgment [102, 103] are **GRANTED IN PART AND DENIED IN PART**. Specifically, they are **GRANTED** as to Count One and Count Two of the Amended Complaint and **DENIED** as to Count Three and Mr. Scott's loss of consortium claim. Defendant Safeco's Motion to Exclude Testimony [104] is **DENIED**.

The parties are **ORDERED** to file a Consolidated Proposed Pretrial Order within 30 days of the date of this Order. If any party requests a stay of this deadline to participate in mediation, they are to contact the Court.

**IT IS SO ORDERED** this <u>2nd</u> day June, 2021.

**Leigh Martin May**
**United States District Judge**